**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-2392**

───────────────

ALIVE CHURCH OF THE NAZARENE, INC.,

Plaintiff – Appellant,

v.

PRINCE WILLIAM COUNTY, VIRGINIA,

Defendant – Appellee.

------------------------------

THE GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS; THE JEWISH COALITION FOR RELIGIOUS LIBERTY,

Amici Supporting Appellant.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:21-cv-00891-LMB-JFA)

───────────────

Argued:  October 26, 2022                     Decided:  January 31, 2023

───────────────

Before KING and HEYTENS, Circuit Judges, and Sherri A. LYDON, United States District Judge for the District of South Carolina, sitting by designation.

───────────────

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Heytens and Judge Lydon joined.

───────────────

**ARGUED:** Benjamin Paul Sisney, THE AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., for Appellant. Alan Frederic Smith, PRINCE WILLIAM COUNTY ATTORNEY'S OFFICE, Prince William, Virginia, for Appellee. **ON BRIEF:** Erik W. Stanley, PROVIDENT LAW, Scottsdale, Arizona; Jordan Sekulow, Stuart J. Roth, Colby M. May, THE AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., for Appellant. Curt G. Spear, Jr., Deputy County Attorney, PRINCE WILLIAM COUNTY ATTORNEY'S OFFICE, Prince William, Virginia, for Appellee. Christopher Pagliarella, YALE LAW SCHOOL FREE EXERCISE CLINIC, Washington, D.C.; Gordon D. Todd, John L. Gibbons, William Thompson, III, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Curiae.

─────────────

KING, Circuit Judge:

In November 2018, plaintiff Alive Church of the Nazarene, Inc. (the "Church"), purchased 17 acres of land — zoned primarily for agricultural use — on which the Church sought to conduct religious assemblies. After defendant Prince William County, Virginia (the "County") denied the Church's request to worship on its property before the Church complied with the zoning requirements, the Church initiated this lawsuit in August 2021 in the Eastern District of Virginia. *See Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, No. 1:21-cv-00891 (E.D. Va. Aug. 3, 2021), ECF No. 1 (the "Complaint").

By its Complaint, the Church has alleged six claims against the County — three claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and three federal constitutional claims. For reasons explained in its Memorandum Opinion of November 2021, the district court dismissed those claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *See Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, No. 1:21-cv-00891 (E.D. Va. Nov. 10, 2021), ECF No. 25 (the "Dismissal Opinion"). In resolving this appeal by the Church, as explained below, we are satisfied to affirm the district court.

I.

A.

Because this appeal centers on certain zoning laws, both state and local, we begin with a review of those provisions. First of all, Virginia allows localities to "regulate,

3

restrict, permit, prohibit, and determine . . . [t]he use of land, buildings, structures and other premises for agricultural, business, industrial, residential, flood plain and other specific uses[.]" *See* Va. Code § 15.2-2280(1). Pursuant to that authority, and in an effort to "create an environment favorable for the continuation [of] farming and other agricultural pursuits," the County has zoned certain areas within its bounds as "A-1, Agricultural" land. We refer herein to the various tracts of land designated by the County as "A-1, Agricultural" as the "Agricultural District."

Land within the Agricultural District — including the Church's 17-acre property — is bound by the requirements set forth in Chapter 32, Article III of the Prince William County Code (the "Agricultural Zoning Ordinance," or simply the "Ordinance"), in addition to the County's general zoning requirements. The self-identified purpose of the Agricultural Zoning Ordinance is to "encourage conservation and proper use of large tracts of real property in order to assure available sources of agricultural products, to assure open spaces within reach of concentrations of population, to conserve natural resources, prevent erosion, and protect the environment; and to assure adequate water supplies." *See* Prince William Cnty. Code § 32-301.01.

To that end, within the Agricultural District, the County has restricted the use of land primarily to agricultural purposes. The County allows 14 uses to operate by right in the Agricultural District, subject to strict development standards. In addition to the 14 by-right uses, the County allows 35 nonagricultural "special uses" — including religious institutions — to operate within the Agricultural District after a site-specific review and subject to conditions outlined in a Special Use Permit (a "SUP"). *See* Prince William

4

Cnty. Code § 32-100, -301.04.  All other uses are prohibited by the County on land lying within the Agricultural District.

Relevant to this appeal, the 14 by-right uses include farm wineries, limited-license breweries, and agricultural operations.  Pursuant to Virginia law, all agricultural operations can carry out agritourism activities.  *See* Va. Code § 15.2-2288.6. "Agritourism" is defined by Virginia law as "any activity carried out on a farm or ranch that allows members of the general public, for recreational, entertainment, or educational purposes, to view or enjoy rural activities, including farming, wineries, ranching, horseback riding, historical, cultural, harvest-your-own activities, or natural activities and attractions."  *Id.* §§ 3.2-6400, 15.2-2288.6.  Within the Agricultural District certain nonagricultural activities, like outdoor meetings, tent revivals, or business events, require a property owner to apply for a Temporary Activity Permit (a "TAP"), which will be granted only if "the proposal will not impair the purpose and intent of the zoning ordinance, and when the use is not so recurring in nature as to constitute a permanent use not otherwise approved on a site plan."  *See* Prince William Cnty. Code § 32-210.01.

Meanwhile, to qualify as a farm winery or limited-license brewery, an organization must (1) be located on a producing farm, vineyard, or orchard; (2) produce its respective beverages on-site; and (3) be licensed by the Virginia Alcohol Beverage Control Board (the "ABC Board").  *See* Prince William Cnty. Code § 32-100.  To preserve the economic vitality of the Virginia wine and beer industries, state law prohibits localities from regulating the "[u]sual and customary activities and events" at farm wineries and limited-license breweries "unless there is a substantial impact on the

5

health, safety, or welfare of the public." *See* Va. Code §§ 15.2-2288.3 (referring to farm wineries); -2288.3:1 (referring to limited-license breweries). In accordance with state law, the County authorizes farm wineries and limited-license breweries to host special events (such as weddings, banquets, and conferences, of up to 150 people) without obtaining a TAP or a SUP to do so. *See* Prince William Cnty. Code § 32-300.07(10)(b).

B.

As reflected in the Complaint, in November 2018, the Church bought its 17 acres of land in Nokesville, Virginia, within the Agricultural District.[1] The Church purchased that particular parcel of property because its prior owners had obtained a SUP allowing them to build a 40,000-square-foot house of worship and to use the land for religious purposes. The Church was able to adopt that SUP — with minimal changes — for its own plans. In addition to allowing the Church to operate within the Agricultural District, the SUP requires it to utilize low-impact development designs for its buildings, construct water retention areas, implement stormwater management strategies, and build turn lanes on roads into the property, if requested by the County. Notably, compliance with those requirements will cost hundreds of thousands of dollars, which the Church does not currently have available. Nevertheless, according to the Complaint, the Church "intends to. . . fulfill the SUP requirements" and build its proposed house of worship. *See* Complaint ¶ 26.

---

[1] Because the district court dismissed the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, we accept the facts alleged in the Complaint as true and recite them in the light most favorable to the Church. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 680 (4th Cir. 2018).

While gathering funds to begin construction, the Church's congregation began meeting at various off-site locations. Initially, the congregation met at a school, but when the school was forced to close in response to the COVID-19 pandemic, the Church moved its religious services to a local farm winery, also located in the County's Agricultural District. The Church subsequently investigated whether it could congregate for religious worship on its own property before it was able to comply with the terms of its SUP. In response, the County's zoning administrator informed the Church that if it licensed itself as a farm winery or limited-license brewery, it could "build without building permits and hold as many events as [it] want[s]." *See* Complaint ¶ 34.

Thereafter, the Church informed the County that it planned to use its property to grow and harvest Christmas trees, fruit trees, and pumpkins, and to sell those products on-site. Concomitantly, the Church sought official confirmation that its plan qualified as an agricultural use allowed to operate by right in the Agricultural District. The County provided such confirmation by letter dated February 26, 2021 (the "Zoning Verification Letter"). Therein, the Zoning Administrator stated that the Church's planned use for the property would be "permitted by right" as the "principal bona fide agricultural use of the property." *See* J.A. 69.[2]

The Zoning Verification Letter further spelled out that the Church could not use the property for any other purpose, or build any structures that are not associated with the approved use. Additionally, the Zoning Verification Letter made clear that "events such

---

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

7

as weddings, wedding receptions, corporate parties/meetings, conferences, banquets, dinners, and private parties would not be permitted to occur on the Property or in any building/structure," unless the Church was issued a farm winery or limited brewery license by the ABC Board or received a TAP. *See* J.A. 70. As such, the Zoning Verification Letter reflected that, if the Church wished to hold religious services on the property before complying with the terms of its SUP, it would need to establish itself as a farm winery or limited-license brewery.

The Church thereafter began the process of establishing itself as a farm winery or limited-license brewery. According to the Complaint, the Church intended to make nonalcoholic cider using fruit harvested from its fruit trees. As required of all farm wineries and limited-license breweries, the Church sought to acquire a license from the ABC Board. Although the Church completed nearly all of the steps necessary to qualify for the license, it ultimately determined that obtaining a license from the ABC Board would violate its sincerely held religious belief against the sale or promotion of alcohol. Consequently, the Church stopped the licensure process. Given the fact that it had no farm winery or limited brewery license and had not complied with the SUP, the Church was thereafter unable to hold religious gatherings on its property.

C.

By its Complaint of August 2021, the Church takes issue with the County's requirement that it and other religious institutions obtain a SUP to operate within the Agricultural District as well as the requirement that the Church obtain a farm winery or limited brewery license from the ABC Board to congregate on its land before complying

8

with its SUP. The Complaint alleges that the Agricultural Zoning Ordinance violates RLUIPA and the Constitution of the United States. According to the three RLUIPA claims, the County's two requirements violate RLUIPA's equal terms, nondiscrimination, and substantial burden provisions. The three constitutional claims meanwhile allege that those requirements contravene the First Amendment's Free Exercise and Peaceable Assembly Clauses, and the Fourteenth Amendment's Equal Protection Clause. In support of its claims, the Church attached the Zoning Verification Letter to the Complaint and incorporated it by reference therein.

In September 2021, the County moved to dismiss the Church's Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing to sue and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Based upon the analysis in its Dismissal Opinion, the district court dismissed the Complaint in its entirety pursuant to Rule 12(b)(6). The Church timely noted this appeal, and we possess jurisdiction under 28 U.S.C. § 1291.[3]

---

[3] By its Dismissal Opinion, the district court rejected the County's Rule 12(b)(1) argument and ruled that the Church possesses Article III standing to sue. Although that ruling is not challenged by the County on appeal, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Having carefully assessed the standing issue, we are satisfied that the court correctly ruled that the Church has Article III standing to pursue its claims.

II.

We review de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013). To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although we are constrained to accept the factual allegations in the complaint as true, "we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *See Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012).

III.

On appeal, the Church challenges the dismissal of each of its claims, identifying several aspects of the Dismissal Opinion that it contends were decided in error. We first address the Church's three RLUIPA claims. We then review and resolve the three constitutional claims.

A.

We begin with the Church's three RLUIPA claims. RLUIPA establishes statutory protections for the free exercise of religion that exceed the requirements contained in the Constitution. *See Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015). In that regard, RLUIPA protects the free exercise of religion by addressing land use ordinances and the religious rights of institutionalized persons. The portion of RLUIPA pertaining to land use is further subdivided into the substantial burden, nondiscrimination, and equal terms

10

provisions.    The Church claims that the County's actions violate all three of those provisions.  We consider each claim in turn.

1.

The first of the Church's RLUIPA claims is its equal terms claim, by which it asserts that the Agricultural Zoning Ordinance treats religious assemblies and institutions worse than nonreligious assemblies and institutions.    Under RLUIPA's equal terms provision, "[n]o government shall impose or implement a land use ordinance in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *See* 42 U.S.C. § 2000cc(b)(1).  To state an equal terms claim, a plaintiff must allege that:  (1) it is a religious assembly or institution, (2) subject to a land use ordinance, and (3) the land use ordinance treats the plaintiff on less than equal terms with (4) a nonreligious assembly or institution.  *See Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 196 (4th Cir. 2022).  Here, it is undisputed that the Church is a religious assembly subject to a land use ordinance.  Our analysis, therefore, focuses on whether the Church has sufficiently alleged that it has been treated on less than equal terms with a nonreligious assembly or institution.

As to that equal terms question, "[i]f a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof." *See Canaan*, 29 F.4th at 196 (quoting *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1311 (11th Cir. 2006)).  Accordingly, to present an equal terms claim, a plaintiff must propose a comparator that is "similarly situated with regard to the

11

ordinance at issue." *See Canaan*, 29 F.4th at 196 (internal quotation marks omitted). Put differently, the nonreligious comparator must be an entity that has the same effect on the ordinance's purpose as a religious assembly or institution. *See, e.g., River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367, 370 (7th Cir. 2010) (rejecting comparison of churches to assemblies that "have different effects on the municipality and its residents").

A land use ordinance violates RLUIPA, for example, if it excludes religious assemblies, but at the same time includes nonreligious assemblies that undermine the ordinance's goal in the same way. *See, e.g., River of Life*, 611 F.3d at 373 (recognizing that "[i]f a church and a community center, though different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other denies equality and violates the equal-terms provision"). Thus, a zoning ordinance that specifically excludes religious institutions from an area zoned for a particular purpose is not necessarily discriminatory, so long as the included uses do not have the same effect on the regulatory purpose as the excluded religious uses. *Id.* (concluding that there was no equal terms violation where zoning ordinance excluded churches along with other noncommercial uses from a commercial district, while including only commercial uses); *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 833 (11th Cir. 2020) (deciding there was no equal terms violation where the challenged ordinance "lump[ed] [churches] in with other non-religious entities in requiring planning approval for projects in residential districts").

12

a.

The Complaint alleges that the County treats the Church worse than nonreligious assemblies because the Church cannot operate within the Agricultural District without a SUP while farm wineries and limited-license breweries can. Focusing on the third and fourth elements of the equal terms claim — whether the Church properly alleged that it has been treated worse than a nonreligious assembly or institution — the district court observed that the nonreligious comparator must be similarly situated to the Church "with respect to the purpose of the underlying ordinance." *See* Dismissal Opinion 11.

To determine the purpose of the Agricultural Zoning Ordinance, the district court looked to the Prince William County Code, which provides that the aim of the Agricultural District is to "encourage 'farming and other agricultural pursuits.'" *See* Dismissal Opinion 11 (quoting Prince William Cnty. Code § 32-301.01) The court then determined that the Church is similarly situated to its "statutory companions" — i.e., those listed among the 35 special uses that must be permitted in the Agricultural District, such as child-care facilities and civic clubs. *Id.* As the court saw it, the Church and those other assemblies and institutions are similarly situated, in that they "are not agricultural and do not advance the [Agricultural District's] purpose." *Id.*

The district court rejected the Church's contention that its "engage[ment] in bona fide agricultural uses" renders it comparable to farm wineries and limited-license breweries — and unlike the nonagricultural entities that require a SUP to operate in the Agricultural District. *See* Dismissal Opinion 12. The court reasoned that the Church's agricultural activity "does not make the comparison to civic clubs and child-care facilities

13

inapt." *Id.* Rather, it "means that instead of comparing the Church to a generic civic club, the Church must be compared to a civic club that, like the Church, is engaged in bona fide agricultural uses." *Id.* The court recognized that "[i]f the County permitted such a civic club to hold gatherings while denying the same to the Church, the Church would state an equal terms claim." *Id.* (internal quotation marks omitted). The Church, however, "has alleged nothing of the sort." *Id.*

Expounding on the Church's effort to liken itself to farm wineries and limited-license breweries, the district court explained that the Church's agricultural activity "does not change the fact that religious institutions are not agricultural by definition and must therefore get permission to operate in the [Agricultural] District." *See* Dismissal Opinion 12 n.5. "In contrast," the court emphasized, "farm wineries and limited-license breweries are allowed in the [Agricultural District] by right because they are, by definition, agricultural." *Id.* In light of that analysis, the court concluded that the Church "has failed to state an equal terms claim." *Id.* at 12 (internal quotation marks omitted).

b.

On appeal, the Church asserts that the district court erred in concluding that the Church is not similarly situated to farm wineries and limited-license breweries. According to the Church, the only distinction is that farm wineries and limited-license breweries can obtain an ABC license while the Church cannot. That difference, the Church contends, does not further the County's goal of preserving farmland. We disagree, however, with the Church's theory.

14

Significantly, farm wineries and limited-license breweries are allowed to host special events because those events further agricultural activity. Farm wineries and limited-license breweries remain profitable by selling their products directly to the public. Hosting special events enhances the ability to market and sell products and therefore increase their economic viability. Put simply, the more profitable farm wineries and limited-license breweries are, the more likely they will continue in operation and draw more investment in the same industry. Because farm wineries and limited-license breweries must be located on producing farms, vineyards, or orchards, investment in their continued success directly advances the promotion of farming.

But allowing religious institutions to conduct worship services does not further the purpose of the Agricultural Zoning Ordinance — that is, to promote farming. Specific to the Church, allowing services would not increase its ability to continue farming its land. Accordingly, we cannot agree with the Church that it is similarly situated to farm wineries and limited-license breweries with regard to the Ordinance. The Church has failed to meet its initial burden of proof by providing a similarly situated comparator with which it has been treated unequally, and has thereby failed to state a RLUIPA equal terms claim.[4]

---

[4] In addition to farm wineries and limited-license breweries, the Church maintains that it is similarly situated to agricultural operations that can conduct agritourism activities. That argument does not help the Church, however, as it has qualified itself as an agricultural operation by growing Christmas trees, fruit trees, and pumpkins, and thus can also conduct agritourism activities. It is solely prevented from conducting nonagricultural activities. In that regard, the County is treating the Church on equal terms with agricultural operations.

15

2.

The second of the Church's RLUIPA claims is its nondiscrimination claim, which is based on an allegation of discriminatory intent. RLUIPA's nondiscrimination provision proclaims that "[n]o government shall impose or implement a land use ordinance that discriminates against any assembly or institution on the basis of religion or religious denomination." *See* 42 U.S.C. § 2000cc(b)(2). Unlike the equal terms or substantial burden provisions of RLUIPA, the nondiscrimination provision requires evidence of discriminatory intent to establish a claim. A plaintiff demonstrates a prima facie case when it alleges facts sufficient to show that the challenged government decision was "motivated at least in part by discriminatory intent." *See Jesus Christ Is the Answer Ministries, Inc. v. Balt. Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019). If a plaintiff sufficiently alleges a prima facie case of discrimination, a court may not dismiss that claim, "even if the defendant advances a nondiscriminatory alternative explanation for its decision, and even if that alternative appears more probable." *Id.*

Probing discriminatory intent involves a "sensitive inquiry" that must take into account both direct and circumstantial evidence, as laid out by the Supreme Court in *Arlington Heights v. Metro. Housing Development*, 429 U.S. 252, 266-68 (1977). *See Jesus Christ Is the Answer*, 915 F.3d at 263. In that inquiry, a court can consider contemporary statements by decisionmakers indicating bias, derisive comments made to lawmakers by members of the community, the historical background of the decision, and any deviations from the standard decisionmaking process implying a decisionmaker's discriminatory intent. *See Arlington Heights*, 429 U.S. at 266-68. To establish a prima

16

facie case of discrimination, that evidence must demonstrate at least some religious animus. *See Jesus Christ Is the Answer*, 915 F.3d at 264 (concluding that community member's disapproving remarks at administrative hearing regarding church, followed by denial of church's land use petition, established prima facie claim of religious animus); *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 559 (4th Cir. 2013) (ruling that community opposition to size of two proposed church buildings implied no religious animus, only objections to large buildings in rural zone).

a.

By its Complaint, the Church alleges that the County contravened the nondiscrimination provision of RLUIPA in two ways. The first is the County's regulatory differentiation between religious institutions and agricultural operations, and the second is the County's requirement that the Church obtain a license from the ABC Board in order to hold religious gatherings on its land. Although the Complaint itself does not allege discriminatory intent, the Church argued to the district court that "intent may be inferred from the treatment itself," including the Zoning Verification Letter indicating that the Church must qualify as a farm winery or limited-license brewery to conduct worship services on its land without a SUP. *See* Dismissal Opinion 13 (quoting Response to Motion to Dismiss).

The district court ruled that, assuming the Complaint's factual allegations are true, those facts do not imply religious animus on the part of the County. The purported differential treatment — that religious institutions need a SUP to operate within the Agricultural District while farm wineries do not — does not illustrate the County's

17

discriminatory intent because, as the court explained in its equal terms analysis, the Church has not properly alleged that it has been subjected to differential treatment. As to the Zoning Verification Letter, the court observed that it does nothing more than spell out the law. The court therefore determined that the Church's dispute is "with the law itself." *See* Dismissal Opinion 14. After pointing out that the Church has alleged no facts indicating that the Agricultural Zoning Ordinance was passed with religious animus, the court deemed the Church's nondiscrimination claim to be insufficient.

b.

Relying on our decision in *Jesus Christ Is the Answer*, the Church maintains on appeal that the district court prematurely dismissed its nondiscrimination claim. Specifically, the Church contends that the court improperly credited the County's alternative explanation for its allegedly discriminatory actions. The Church asserts that it presented a prima facie case for discrimination which, as in *Jesus Christ Is the Answer*, cannot be dismissed at the motion to dismiss stage. To support its assertion of a prima facie case, the Church points to the Agricultural Zoning Ordinance's SUP requirement and to the Zoning Verification Letter.

We agree, however, with the district court's assessment of the nondiscrimination claim. The Complaint does not allege that the County either passed the Agricultural Zoning Ordinance with discriminatory intent or enforced it in a discriminatory manner. Nor has the Church asserted facts sufficient to establish a prima facie claim of religious animus by the County. The Church simply points us again to the SUP requirement and to the Zoning Verification Letter. But neither implies religious animus. As in *Bethel*

18

*Outreach Ministries,* there is no evidence that any of the decisionmakers or community members expressed any animosity toward the Church in particular or religious institutions in general. Nor does the Zoning Verification Letter represent a deviation from the existing law or express any opinion about the Church's proposed religious activities. Having been presented with nothing more, we are satisfied to agree with the district court that the Church has failed to state a RLUIPA nondiscrimination claim.

3.

The Church's third and final RLUIPA claim is its substantial burden claim. Relevant to that claim, RLUIPA provides:

> No government shall impose or implement a land use ordinance in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution —
>
> (A)    is in furtherance of a compelling governmental interest; and
>
> (B)    is the least restrictive means of furthering that compelling governmental interest.

*See* 42 U.S.C. § 2000cc(a)(1). To determine whether an impermissible burden has been imposed, we ask (1) whether the impediment to the organization's religious practice is "substantial," and (2) whether the government is responsible for the impediment. *See Canaan*, 29 F.4th at 192.

Under the first prong of the substantial burden analysis, in the land use context, an impediment is substantial if "the property would serve an unmet religious need, the restriction on religious use is absolute rather than conditional, and the organization must

19

acquire a different property as a result." *See Jesus Christ Is the Answer*, 915 F.3d at 261. An impediment is absolute where land use restrictions wholly prevent a religious organization from building any house of worship on its property, rather than simply imposing limitations on the building. *See Bethel World Outreach Ministries,* 706 F.3d at 557-58. That is, if a land-use restriction would limit the building's size, that restriction is not an absolute impediment, as it would still allow a religious institution to construct a building. *See Canaan*, 29 F.4th at 194 (recognizing that "[t]he fact that there are practical and legal restrictions preventing a larger development on the [p]roperty does not amount to a RLUIPA substantial burden violation").

Pursuant to the second prong of the substantial burden analysis, even if a religious institution can establish that it faces an absolute impediment to religious practice, its claim will fail if the burden was "self-imposed." *See Canaan*, 29 F.4th at 194; *see also Andon, LLC v. City of Newport News*, 813 F.3d 510, 515 (4th Cir. 2016) ("A self-imposed hardship generally will not support a substantial burden claim under RLUIPA, because the hardship was not imposed by governmental action altering a legitimate, pre-existing expectation that a property could be obtained for a particular land use."). As such, if a religious institution acquires land knowing that it is subject to certain restrictions, any burden resulting from those restrictions has not been imposed by the government; but rather, the burden is self-imposed. *See Canaan*, 29 F.4th at 194-95. Nonetheless, if an organization knowingly purchases land subject to certain restrictions, but reasonably expects that it can comply with those restrictions, the burden is not self-

20

imposed if the government "subsequently makes development and use practically impossible." *Id.* at 194.

a.

The Complaint alleges that the Agricultural Zoning Ordinance's SUP requirement imposes a substantial burden on religious institutions by "forcing [churches] to expend substantial resources to obtain a SUP before meeting to worship." *See* Complaint ¶ 112. The district court rejected the Church's substantial burden claim because the Church had purchased the land with full knowledge of the applicable Agricultural Zoning Ordinance and its SUP requirement. In fact, as the court noted, "the Church admitted. . . that it purposely paid more for the land *because* it had a SUP." *See* Dismissal Opinion 15 (internal quotation marks omitted). The court ruled that any burden was therefore self-imposed.

The district court additionally considered whether the government had changed its posture with respect to religious land use after the Church bought its land and determined that it had not. In essence, the court explained, the Church is seeking a way to avoid complying with its SUP and to avoid satisfying the other statutory requirements that would allow it to host special events on its property. In other words, the Church seeks an "automatic exemption to religious organizations from generally applicable land use ordinances" that would "favor religious uses over secular uses." *See* Dismissal Opinion 15 (quoting *Andon, LLC*, 813 F.3d at 516).

21

b.

On appeal, the Church shifts focus, claiming that "the SUP is a distraction" and asking us instead to concentrate solely on the requirement that it obtain an ABC license in order to congregate on its land before complying with the terms of its SUP. *See* Br. of Appellant 35. In any event, we agree with the district court that the Church's complained-of burden is self-imposed. That is because the Church did not have a reasonable expectation of religious land use without complying with its SUP or the statutory requirements to become a farm winery or limited-license brewery.

Notably, the Church's substantial burden claim also fails for the independent reason that the impediment to religious land use is not absolute. Indeed, the Church itself recognizes that it can and will use its property for religious purposes *without* any license from the ABC Board when it complies with the SUP. The Agricultural Zoning Ordinance thus does not require the Church to seek out new property, or even to adjust its plans to erect its buildings. Rather, the Church must simply comply with the terms of its SUP. In all of these circumstances, the Church's substantial burden claim fails.[5]

---

[5] The Church suggests on appeal that it had a reasonable expectation — absent an ABC license or compliance with its SUP — of conducting religious services as agritourism events on its land. *See* Br. of Appellant 35 (identifying "agritourism events" as "what it is seeking to do"). We decline to reach that theory, however, which would require us to interpret the Virginia statute defining "agritourism" and consider whether it includes religious worship services. Because we are satisfied that the Church's substantial burden claim fails due to the fact that the complained-of impediments are not absolute, we need not reach the Virginia state law question.

B.

We turn now to the Church's three federal constitutional claims. More specifically, the Church claims that the SUP requirement and the ABC licensure requirement violate the First Amendment's Free Exercise and Peaceable Assembly Clauses and the Fourteenth Amendment's Equal Protection Clause. The Church's constitutional claims rest on the same factual allegations as its RLUIPA claims. We address each constitutional claim in turn.

1.

First is the Church's free exercise claim. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *See* U.S. Const. amend. I. As the Supreme Court has recognized, the Free Exercise Clause protects against laws that discriminate against or among religious beliefs or that restrict certain practices because of their religious conduct. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). Under the Free Exercise Clause, a facially neutral and generally applicable ordinance is subject to rational basis review, "even where it has the incidental effect of burdening religious exercise." *See Canaan*, 29 F.4th at 198. Laws that are not neutral and generally applicable, however, are subject to strict scrutiny review. *Id.*

To determine a law's neutrality, therefore, we must determine its object. *See Lukumi*, 508 U.S. at 534. If a law has "no object that 'infringe[s] upon or restrict[s] practices *because* of their religious motivation,'" then the law is neutral. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99 (4th Cir. 2013) (quoting *Lukumi*, 508 U.S. at 533)

(alterations and emphasis in original). On the other hand, if a law limits religious practice "without a secular meaning discernable from the language or context," then the law lacks neutrality. *Id.*

When presented with a law that affects religious practice, even if indirectly, a court must look behind the law's text to determine if it was enacted "because of" and not "in spite of" its effect on religion. *See Lukumi*, 508 U.S. at 540. Such an inquiry compels the court to look at contemporaneous statements made by decisionmakers or community members surrounding the law's passage, and any deviations from standard decisionmaking procedures. *Id.* at 541-42 (applying the *Arlington Heights* "sensitive inquiry" into lawmakers' intent). In the land use context, if a particular ordinance explicitly regulates religious institutions, it is nevertheless neutral if religious institutions are "just one among many" other nonreligious regulated uses, and there is no independent evidence of religious animus. *See Civ. Liberties of Urb. Believers v. City of Chicago*, 342 F.3d 752, 763 (7th Cir. 2003) (finding commercial zoning ordinance neutral even when it "includes 'church' as just one among many and varied religious and nonreligious regulated uses" because there is no record, "nor do [a]ppellants articulate in anything but conclusory terms that the object and purpose of the [challenged ordinance] are anything other than those expressly stated therein").

a.

The Complaint alleges that both the SUP requirement and ABC licensure requirement lack neutrality and violate the Free Exercise Clause of the First Amendment. Specifically, the Church asserts that the SUP requirement is facially discriminatory

24

because it explicitly subjects religious institutions to differential treatment, and the ABC licensure requirement is discriminatory because it only affects religious practice. According to the Church, that effect demonstrates that the licensure requirement was enacted to target religious practice. As the Church would have it, the SUP and licensure requirements are therefore subject to — and fail — strict scrutiny.

The district court concluded that the Agricultural Zoning Ordinance is subject to only rational basis review, and that it survives. Specifically, the court determined that the law is facially neutral (and generally applicable) because it treats all similarly situated entities alike — it does not single religious institutions out for differential treatment. *See* Dismissal Opinion 16. Furthermore, the court observed that the Church alleged no facts indicating that the County created the Agricultural District for the purpose of infringing upon or restricting religious practice. *Id.* at 17.

In thus conducting its rational basis review, the district court recognized that the applicable standard requires the Church to establish that the Agricultural Zoning Ordinance is not rationally related to a legitimate government interest. *See* Dismissal Opinion 17 (citing *Bethel World Outreach Ministries*, 706 F.3d at 561). The court then invoked our precedent for the proposition that the Agricultural District's purpose — "to prioritize farming and other agricultural pursuits" — is a legitimate government interest. *Id.* (internal quotation marks omitted) (citing *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 821 n.3 (4th Cir. 1995)). Addressing the SUP requirement, the court concluded that requiring religious institutions to obtain a SUP before operating in the Agricultural

25

District is rationally related to the County's legitimate interest "because religious institutions generally are not agricultural." *Id.*

With respect to the ABC license requirement, the district court identified an additional legitimate government interest: preserving the economic vitality of Virginia's wine and beer industries. *See* Dismissal Opinion 18. The court reasoned that such interest justified "specifically prioritizing farm wineries and limited-license breweries within the [Agricultural] District," as those operations "must be located on a farm, which limits their ability to locate elsewhere (a limitation the Church does not have)." *Id.* That is, the court concluded that allowing farm wineries and limited-license breweries to operate in the Agricultural District by right "is rationally related to furthering the [governmental] interest in preserving the vitality of the wine and beer industry." *Id.*

b.

The Church claims on appeal that the SUP requirement is facially discriminatory because it singles out religious institutions for differential treatment. The Church also contends that the ABC licensure requirement lacks neutrality, in that it is designed to affect only religious institutions. According to the Church, the requirement that farm wineries and limited-license breweries obtain an ABC license targets religious institutions because only religious institutions are unable, due to their beliefs, to get such a license. The Church again points us to the Zoning Verification Letter, contending that it provides support for the proposition that "the Church is treated differently than every other use that is able to obtain a liquor license." *See* Br. of Appellant 38.

26

With respect to the SUP requirement, we observe that although the Agricultural Zoning Ordinance requires religious institutions to secure a SUP, it does so for the secular purpose of preserving agricultural land. As previously discussed with respect to the RLUIPA nondiscrimination claim, the Church has not alleged facts sufficient to claim that the SUP requirement was designed for the purpose of infringing religious exercise. Rather, the Church asks us to infer from the fact that the Ordinance explicitly requires religious institutions — along with 34 other nonreligious land uses — to obtain a SUP, that the Ordinance was written with the intent to target religious practice. Yet nothing in the Church's Complaint suggests, nor does the Church articulate in anything but conclusory terms, that the object of the Ordinance is anything other than the one expressly stated therein — i.e, to promote farming. The SUP requirement is, therefore, neutral.

We reach the same conclusion with respect to the ABC licensure requirement. The Agricultural Zoning Ordinance defines farm wineries and limited-license breweries as organizations located on a working farm that produce their respective beverages on site and are licensed by the ABC Board. That definition makes no mention of religious practice, either explicitly or implicitly. Although it might incidentally burden an agricultural religious institution that wishes to get around its SUP, the Church has not alleged facts sufficient to suggest that the County required farm wineries to obtain farm winery licenses, or limited-license breweries to obtain limited brewery licenses, with such a result in mind.

27

In these circumstances, we agree with the district court that the Agricultural Zoning Ordinance is subject to rational basis review. We further agree with the court that the Agricultural Zoning Ordinance survives rational basis review and therefore does not contravene the Free Exercise Clause of the First Amendment.

2.

Next, we turn to the Church's peaceable assembly claim. In pertinent part, the First Amendment provides that "Congress shall make no law. . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." *See* U.S. Const. amend. I. It has long been established, however, that the government may impose content-neutral "time, place, and manner" restrictions on those First Amendment rights. *See Cox v. New Hampshire*, 312 U.S. 569, 574-78 (1941). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Where a restriction is content neutral, the restriction must be "justified without reference to the content of the regulated speech," narrowly tailored to further a substantial governmental interest, and leave open "ample alternative channels of communication." *See Rock Against Racism*, 491 U.S. at 791. The requirement of narrow tailoring is satisfied "so long as the . . . ordinance promotes a substantial government interest that would be achieved less effectively absent the ordinance." *Id.* at 799. The ordinance does not have to use the "least restrictive or least intrusive means" of promoting its goal. *Id.* at

28

798. Indeed, the requirement of narrow tailoring is met if "a substantial portion" of the law's burden on assembly serves to advance its goals. *See Am. Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 610 (4th Cir. 2001).

a.

For the purposes of the County's motion to dismiss, the Church conceded in the district court that the Agricultural Zoning Ordinance contains content-neutral time, place, and manner restrictions that are subject to intermediate scrutiny. In opposing the dismissal of its peaceable assembly claim, the Church focused on the fact that — although it had started growing apple trees, Christmas trees, and pumpkins — it was denied permission to worship on its land solely on the basis of its inability to obtain an ABC license. Prohibiting worship services in these circumstances, the Church argued, does not further the County's interest in promoting farming and preserving agricultural land.

Applying intermediate scrutiny, the district court first considered the County's assertion of a substantial government interest. Consistent with its analysis of the Church's free exercise claim, the court concluded that the County has a substantial interest in promoting both farming generally and the wine and beer industries specifically. *See* Dismissal Opinion 19. Additionally, based on our precedent recognizing a substantial government interest in preserving a county's aesthetics, the court reasoned that "conserving agricultural land…in the ever-growing Washington, D.C. metropolitan area, is undoubtedly a substantial government interest." *Id.* (citing *Wag More Dogs*, 680 F.3d at 369).

29

In next determining whether the Agricultural Zoning Ordinance is narrowly tailored, the district court rejected the Church's theory that the Ordinance failed intermediate scrutiny because it could not "demonstrate how excluding churches engaged in agricultural production furthers the goal of preserving agricultural land." *See* Dismissal Opinion 19. The problem with the Church's theory, the court explained, is that the Agricultural Zoning Ordinance need not be the least restrictive or intrusive means of promoting the County's goal. *Id.* at 19-20. The court then decided that the Ordinance "is narrowly tailored precisely because it does not bar entities that primarily have a non-agricultural purpose, like the Church, from assembling in the [Agricultural District]." *Id.* at 20. Moreover, the court observed that the Ordinance leaves open ample alternative avenues for the Church to assemble, including religious gatherings on its property once it complies with its SUP. *Id.*

b.

On appeal, the Church argues that the district court erred in deciding that requiring a religious institution to obtain an ABC license before it can operate on agricultural land survives intermediate scrutiny. *See* Br. of Appellant 40 ("The County . . . has identified no evidence or argument demonstrating how the exclusion of churches from the [Agricultural District] on the basis that they cannot obtain liquor licenses due to their sincerely held religious beliefs furthers the goal of preserving agricultural land."). Subjecting the ABC licensure requirement to the scrutiny required of content-neutral time, place, and manner restrictions, the Church contends, reveals that the Ordinance infringes on assembly more broadly than necessary to achieve its goal.

30

As the district court concluded, however, the Agricultural Zoning Ordinance is narrowly tailored because it leaves open ample other avenues for assembly. While the requirement to obtain an ABC license to hold special events as a farm winery incidentally burdens those religious organizations that are prevented from obtaining an ABC license because of their sincerely held religious beliefs, those organizations can still assemble on land within the Agricultural District if they obtain a SUP. Meanwhile, the requirement to get a SUP is narrowly tailored because it allows the County to achieve its goal of preserving farmland. And as the Church alleges in its Complaint, it has not been prevented from assembling at schools, licensed farm wineries, and online. In these circumstances, the Church has failed to state a peaceable assembly claim.

3.

Finally, we address the Church's equal protection claim. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." *See* U.S. Const. amend. XIV, § 1. The Equal Protection Clause's central aim is to bar government decisionmakers from "treating differently persons who are in all relevant respects alike." *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Accordingly, "[t]o succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated, and that the unequal treatment was the result of intentional or purposeful discrimination." *See Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). If the plaintiff makes this initial showing, then the law is subject to strict scrutiny. *See*

31

*Morrison*, 239 F.3d at 654.  Under strict scrutiny review, a law is presumptively unconstitutional, unless the government can show it is narrowly tailored to achieve a compelling government interest.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S 432, 440 (1985).  Under rational basis review, on the other hand, a law is presumptively constitutional, and the claimant bears the burden of showing that the law is not rationally related to any legitimate government interest.  *Id.*

a.

The Complaint alleges that because the Agricultural Zoning Ordinance treats the Church less favorably than farm wineries, limited-license breweries, and agricultural operations, with which the Complaint contends the Church is similarly situated, the Ordinance is subject to strict scrutiny under the Equal Protection Clause.  The Complaint further asserts that the Ordinance fails strict scrutiny because it does not serve a compelling government interest and is not the least restrictive means to accomplish the County's goal.

The district court dismissed the equal protection claim on a basis similar to the Church's RLUIPA nondiscrimination and First Amendment free exercise claims:  the failure to present any facts establishing discriminatory intent on the part of the County. *See* Dismissal Opinion 21.  Additionally, the court concluded that its analysis of the Church's RLUIPA equal terms claim "dooms the equal protection claim."  *Id.*  That was because, as the court explained in regard to the equal terms claim, the Church is not similarly situated to farm wineries with respect to the purposes of the Agricultural Zoning Ordinance.  *Id.* (explaining that, in the equal protection context, similarly situated entities

32

must be "in all relevant aspects alike").  Having no reason to apply strict scrutiny, the court upheld the Ordinance on rational basis review and dismissed the Church's equal protection claim.

b.

On appeal, the Church takes issue with the district court's ruling that the Agricultural Zoning Ordinance should be subject only to rational basis review.  The Church again contends that it is similarly situated to farm wineries, limited-license breweries, and agricultural operations.  Moreover, the Church asserts that, because it is conducting agricultural activities on its property, "the only appreciable difference between the Church and farm wineries, limited-license breweries and agritourism activities is that the Church is religious."  *See* Br. of Appellant 41.  To distinguish between entities on the basis of their religious status, the Church maintains, is to make a distinction based on a fundamental right, which triggers strict scrutiny.

We agree, however, with the district court's well-reasoned decision.  As heretofore explained with respect to the RLUIPA equal terms claim, even considering its ongoing agricultural activities, the Church is not similarly situated to farm wineries and limited-license breweries because allowing the Church to operate unregulated within the Agricultural District undermines the goal of the Agricultural Zoning Ordinance — that is, to promote farming and preserve agricultural land.  Contrary to the Church's position, religious institutions and farm wineries or limited-license breweries are distinguishable based on the fact that the latter must be located on producing farms while the former face

33

no such restrictions.[6]    Moreover, and as discussed with regard to the Church's nondiscrimination claim, the Church has alleged no facts suggesting that the County passed the Ordinance with religious animus.   Accordingly, we are satisfied that the Church's equal protection claim fails as a matter of law.

IV.

Pursuant to the foregoing, we reject each of the Church's appellate contentions and affirm the judgment of the district court.

*AFFIRMED*

---

[6] As discussed with regard to the equal terms claim, now that the Church has established itself as an agricultural operation, it can, like other agricultural entities, conduct agritourism.  But, also like other agricultural operations, the Church must obtain a TAP to conduct nonagricultural activities.  The Church, therefore, has not alleged any differential treatment from agricultural operations.